******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# CLEVELAND BROWN *v.* COMMISSIONER OF CORRECTION
## (AC 47568)

Cradle, C. J., and Westbrook and Wilson, Js.

*Syllabus*

The petitioner, who previously had been convicted, after a jury trial, of murder and carrying a pistol without a permit, appealed following the granting of his petition for certification to appeal from the habeas court's judgment denying his petition for a writ of habeas corpus. He claimed, inter alia, that his criminal trial counsel, F, rendered ineffective assistance by failing to offer as substantive evidence, pursuant to *State* v. *Whelan* (200 Conn. 743), the prior written statement of a state's witness, P, that she had provided to the police, that contradicted her testimony that she had seen the petitioner shoot the victim. *Held*:

The habeas court incorrectly concluded that the petitioner did not provide any legal basis for the admission into evidence of P's written statement under *Whelan* at the criminal trial, as the transcript of that trial showed that the statement was inconsistent with P's testimony in significant ways, P admitted during her testimony that her written statement, in which she did not state that she saw the petitioner shoot the victim, contradicted her testimony at trial, and the statement met the *Whelan* requirements for admissibility.

The habeas court correctly concluded that the petitioner failed to prove that F rendered deficient performance by not offering P's written statement into evidence pursuant to *Whelan*, as F had made an objectively reasonable, strategic decision not to offer the statement in light of his concern about exposing the jury to portions of the statement that corroborated the state's case, which would have undermined his defense strategy of relying on his cross-examination of P to highlight the inconsistencies between her trial testimony and her prior statement.

The petitioner did not establish that F rendered deficient performance in failing to demonstrate that it was not possible for P to have witnessed the shooting, contrary to her testimony at the criminal trial, as F's conduct fell within the wide range of reasonable professional assistance because it was objectively reasonable for him to conclude that the jury had before it ample evidence from which to determine whether P was able to observe the petitioner at the time of the shooting, and it was reasonable trial strategy for F to impeach P by focusing on compelling evidence that she did not witness the shooting rather than suggesting to the jury that her trial testimony was not possibly accurate.

Argued December 15, 2025—officially released June 9, 2026

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland

and tried to the court, *Bhatt, J.*; judgment denying the petition, from which the petitioner, on the granting of certification, appealed to this court. *Affirmed.*

*Michael W. Brown*, assigned counsel, for the appellant (petitioner).

*Rebecca R. Zeuschner*, deputy assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, and *Erin Stack*, assistant state's attorney, for the appellee (respondent).

*Opinion*

WILSON, J. Following the granting of certification by the habeas court, the petitioner, Cleveland Brown, appeals from the court's judgment denying his amended petition for a writ of habeas corpus. On appeal, the petitioner claims that the court erred in concluding that his criminal trial counsel did not render ineffective assistance by failing (1) to offer the prior, inconsistent written statement of a key prosecution witness as substantive evidence under *Whelan*,[1] and (2) to demonstrate the factual impossibility of certain of the trial testimony of that witness. We disagree and, accordingly, affirm the judgment of the habeas court.

The following facts and procedural history, as reflected in the record or set forth in the habeas court's memorandum of decision, are relevant to this appeal. Following a jury trial, the petitioner was convicted of murder in violation of General Statutes § 53a-54a (a) and carrying a pistol without a permit in violation of General Statutes § 29-35 (a). The petitioner was sentenced by the trial court, *Dewey, J.*, to fifty years of incarceration.

On the basis of the evidence presented at the petitioner's criminal trial, the jury reasonably could have found that, in the early morning of June 11, 2014, the petitioner and the victim, Tyrone Taylor, were in the vicinity of a corner store located at Vine Street and

---

[1] See *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

Albany Avenue in Hartford. The petitioner was arguing with the victim about the victim selling drugs in the area. Following the argument, the petitioner walked up Magnolia Street, and the victim walked up Vine Street. The petitioner then walked through a shortcut that runs between Magnolia Street and Vine Street, shot the victim in the chest, and left the scene. At 2:43 a.m., Officer Greg Dzierzgowski of the Hartford Police Department was dispatched to 26 Vine Street after a gunshot detection system the police utilize indicated that a gunshot had occurred at that location. Dzierzgowski found the victim, who was unresponsive, lying in the street. Several items were located around the victim, including a can of Steel Reserve beer. The victim died as a result of the injuries sustained from the shooting.

The petitioner appealed from the judgment of conviction, raising the sole issue of whether "the trial court failed to ensure that the trial transcript reflected each individual juror's oral concurrence with the jury verdict." *State* v. *Brown*, 185 Conn. App. 806, 807, 198 A.3d 687 (2018). This court affirmed the judgment of conviction. See id., 812.

In 2019, the petitioner, in a self-represented capacity, brought a petition for a writ of habeas corpus. In November 2023, the petitioner, then represented by counsel, filed an amended petition. Among the claims raised by the petitioner was that his criminal trial counsel, John E. Franckling, did not render effective assistance in that he failed (1) to introduce into evidence, pursuant to *Whelan*, the written statement that Charlotte Poteat had given to the police,[2] and (2) to cross-examine and impeach Poteat about the impossibility of the accuracy of certain of her trial testimony, specifically, that she had observed the petitioner shoot the victim.[3] At a trial on February

[2]The witness' name is spelled "Poteat" throughout the record; however, her name is spelled "Poteet" in her sworn statement to the police. In this opinion, we refer to the witness, as the criminal court did, as "Poteat."

[3]In his amended habeas petition, the petitioner also claimed that Franckling was ineffective for failing (1) "to adequately investigate the case prior to trial," (2) "to adequately communicate with the petitioner,"

15, 2024, the habeas court, *Bhatt, J.*, heard testimony from Franckling and the petitioner and admitted into evidence various exhibits, including the transcript of the petitioner's 2016 criminal trial. On February 23, 2024, the court issued a memorandum of decision in which it denied the petitioner's claims.

Both of the claims raised in this appeal relate to Poteat's testimony at the petitioner's criminal trial on March 9, 2016, when she appeared as a witness for the state. Poteat testified that the victim, who she referred to as "Tek," was "like family" to her. Poteat knew the petitioner, who she referred to as "C.B.," for many years but did not consider him to be a friend. On June 11, 2014, at approximately 2 a.m., Poteat's friend, who she referred to as "Jojo," drove her to the corner store at Vine Street and Albany Avenue in Hartford. Jojo parked her car at a bus stop on the corner of Burton Street and Albany Avenue. Poteat was going to go into the store but noticed an argument taking place outside of the store and did not get out of the car at that time. Soon thereafter, Poteat got out of the car "to be nosy." Poteat overheard the petitioner and the victim arguing "about drugs," specifically, that the petitioner "didn't want [the victim] to commit any transactions in that area." The victim "wasn't backing down," but the men went their separate ways when the petitioner walked up Magnolia Street and the victim walked up Vine Street.

Poteat testified that she saw that the petitioner "looked back like to make sure that [the victim] was gone up Vine [Street] . . . ." Poteat then got back into the car and instructed Jojo to drive to Magnolia Street and Albany Avenue.[4] From the car, which was parked "in the middle

(3) "to properly advise the petitioner on the strengths and weaknesses of the state's case," (4) "to discuss trial strategy with the petitioner," and (5) "to communicate and explain the state's offers." In this appeal, the petitioner does not challenge the habeas court's denial of these claims.

[4]Poteat testified that Jojo's car was not parked at the corner of Magnolia Street and Albany Avenue. Poteat stated: "It's late at night, there's . . . really no cars out there. It's people out there, but there is barely no cars out there and I'm not parked accurately at the corner. I'm in like close in the middle of the street. I can see down the street."

of the road," Poteat could see down Magnolia Street. Poteat then observed the petitioner walk "through the cut," which she described as "a shortcut that gets you to Vine Street from Magnolia [Street]" and would take "no time" to traverse. Once "[the petitioner] made the cut," Poteat instructed Jojo to drive in reverse to Vine Street and Albany Avenue because she thought "that they're going to fight." At Vine Street, Poteat got out of the car, crossed the street, and stood close behind the victim. She recalled: "When [the victim] took a sip of his beer, he stopped and he looked like in the direction of the cut and [the petitioner] was there. His hand was raised, [the petitioner's hand] not [the victim's hand], and fire came from his hand. A shot and fire came from his hand, and I turned around and I . . . left . . . ." Poteat testified that she was standing approximately twenty feet from the petitioner at the time of the shooting and that, after she saw a flash of fire emanate from the gun in the petitioner's hand, the petitioner "[n]onchalantly turned around and he looked at me." Thereafter, Poteat returned to the car and went home.

During Poteat's direct examination, the prosecutor questioned her about a written statement that she had provided to Detective Dennis DeMatteo of the Hartford Police Department. Poteat agreed that, in her written statement, she stated that she saw the petitioner approach the victim and, because she did not think anything would happen, she turned around. As she turned, she heard a gunshot and ran from the scene. Poteat agreed with the prosecutor that her testimony at trial was different from the facts in her written police statement, but she explained that the difference was "[b]ecause I feel like the truth needed to be heard, and I didn't sleep that night and I didn't want to go outside 'cause I felt like I just needed to tell the truth."

On cross-examination, Franckling highlighted more of the differences between Poteat's trial testimony and the facts in her written police statement. For example,

Poteat also testified that, from the middle of the street, "you can see down the street. The lighting is good. And me being from Hartford all of my life, I know where the cut is."

Franckling elicited that Poteat did not remember telling DeMatteo that the victim had walked into the corner store after the initial argument ended. When asked whether her memory was better in 2014 or at the time of trial, Poteat stated: "It was pretty fresh, and I was and still [am] shooken up about it." Franckling elicited that Poteat did not recall telling DeMatteo that she had observed the victim remaining in the store or that she had observed the petitioner leaving the store. She recalled, however, telling DeMatteo that the petitioner walked up Magnolia Street. Poteat testified that she did not recall stating that she had observed the victim walking out of the store with a can of beer but testified that, when she arrived at the store, the victim was already standing outside with the beer in his hand and that the petitioner was outside of the store.

Further, on cross-examination, Franckling elicited testimony from Poteat that, although she had told DeMatteo that she saw the victim exit the store with the beer, take a sip, and keep walking, she testified at trial that the victim did not open the beer until he was on Vine Street, she saw him take a sip of the beer and that he did not continue walking with the beer. At trial, Poteat testified that, "[w]here he took his sip at is where he died at." Franckling elicited that Poteat did not recall telling DeMatteo that the victim had taken a sip of beer and kept walking. Franckling also elicited testimony from Poteat that, in contrast to her trial testimony that Jojo did not get out of the car at all, she told DeMatteo that she and her friend had run back to the car following the shooting. Poteat testified that she did not recall telling this to DeMatteo.

After Poteat testified, the state recalled DeMatteo. Franckling cross-examined DeMatteo with respect to the inconsistencies between Poteat's written police statement and her trial testimony. DeMatteo testified that Poteat had told him that, after she watched the initial argument between the petitioner and the victim, she watched the victim walk away. Poteat also told him

that the victim had walked into the corner store on Vine Street and Albany Avenue. DeMatteo explained that, if Poteat's written police statement stated that the victim had stayed in the store while the petitioner walked away from the store, then that was what Poteat had told him. Additionally, DeMatteo recalled Poteat stating that, when the petitioner left the store, he went up Magnolia Street and that, after the victim had left the store, he went up Vine Street. DeMatteo testified that, in the police statement, Poteat stated that she and her friend had run back to the car after the shooting but that Poteat did not mention a person known as Jojo at that time.

With respect to the two ineffective assistance of counsel claims at issue in this appeal, the habeas court stated in its memorandum of decision: "Franckling cross-examined Poteat about her ability to see 'the cut' due to a bend in Magnolia Street. He questioned her about inconsistencies between testimony and her statement to [the] police. While it is true that he did not cross-examine her about her testimony that she could see the shooting, contrary to her statement, that inconsistency was already before the jury because the state asked her about that inconsistency. [The petitioner] has not provided any legal basis for the admission of the statement as substantive evidence. [Poteat's] credibility was impeached by questioning on both direct and cross. There is no deficient performance as to any of his claims." Thereafter, the court granted the petitioner's petition for certification to appeal. This appeal followed.

"[Our] standard of review of a habeas court's judgment on ineffective assistance of counsel claims is well settled. In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary . . . .

"In *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)], the United

States Supreme Court established that for a petitioner to prevail on a claim of ineffective assistance of counsel, he must show that counsel's assistance was so defective as to require reversal of [the underlying] conviction . . . . That requires the petitioner to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable . . . .

"To satisfy the performance prong . . . the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law . . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different . . . . A court can find against a petitioner, with respect to a claim of ineffective assistance of counsel, on either the performance prong or the prejudice prong . . . ." (Citation omitted; internal quotation marks omitted.) *Stephen J. R.* v. *Commissioner of Correction*, 178 Conn. App. 1, 7–8, 173 A.3d 984 (2017), cert. denied, 327 Conn. 995, 175 A.3d 1246 (2018).

"We also are mindful that [a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . [C]ounsel is strongly presumed to have rendered adequate assistance and

made all significant decisions in the exercise of reasonable professional judgment. . . .

"[T]he United States Supreme Court has emphasized that a reviewing court is required not simply to give [the trial attorney] the benefit of the doubt . . . but to affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as [he] did . . . . [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; [but] strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." (Citations omitted; internal quotation marks omitted.) Id., 8–9. We now turn to the merits of the petitioner's claims.

I

The petitioner claims that the habeas court erred in concluding that Franckling did not render ineffective assistance of counsel by failing to offer into evidence the written statement that Poteat had provided to the police as substantive evidence under *Whelan* at his criminal trial. The petitioner's argument is twofold. First, he asserts that "[t]he habeas court erred by concluding that there was no legal basis for the Poteat statement to be admitted into evidence at the petitioner's criminal trial." Second, he contends that the court's erroneous conclusion led it to "not fully address the significance of trial counsel's error . . . ." According to the petitioner, his ineffective assistance claim has merit because Franckling had no strategic reason for not offering Poteat's statement under *Whelan*. We agree with the petitioner's first argument but disagree with his second argument.

We first address the habeas court's conclusion that there was no legal basis for Poteat's police statement to be admitted into evidence under *Whelan* at the criminal trial. "The *Whelan* rule is an exception to the rule against hearsay. It permits a nonparty witness' prior inconsistent statements to be used for substantive purposes, that is, to

prove the truth of the matters asserted therein, provided that the following conditions exist: **(1)** the statement must be in writing, **(2)** the statement must be signed by the declarant, **(3)** the declarant must possess personal knowledge of the facts contained therein, and **(4)** the declarant must testify at trial and be subject to cross-examination *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986); see also Conn. Code Evid. §8-5 (1).[5] The *Whelan* rule is meant to assure a reasonable degree of reliability in a proffered statement; to be admissible, a prior inconsistent statement must have been given under circumstances ensuring its reliability and trustworthiness. . . . The admission of prior statements under the rule affords the trier of fact an opportunity to gauge a witness' present testimony after such witness is confronted with a prior inconsistent statement. [G]iven the opportunity for meaningful cross-examination of such a witness, the witness will be forced either to explain the discrepancies between the earlier statements and [her] present testimony, or to deny that the earlier statement was made at all. . . . After this type of examination, the jury can draw whatever conclusions concerning the witness' testimony that it deems to be appropriate." (Citations omitted; footnote added; internal quotation marks omitted.) *State* v. *Hersey*, 78 Conn. App. 141, 148–49, 826 A.2d 1183, cert. denied, 266 Conn. 903, 832 A.2d 65 (2003). "[O]nce the proponent of a prior inconsistent statement has established that the statement satisfies the requirements of *Whelan*, that statement, like statements

[5]As the commentary to §8-5 of the Connecticut Code of Evidence explains, "[§] 8-5 (1) incorporates the rule of *State* v. *Whelan*, [supra, 200 Conn. 753], and later developments and clarifications." Conn. Code Evid. §8-5 (1), commentary. Section 8-5 provides in relevant part: "The following are not excluded by the hearsay rule, provided the declarant is available for cross-examination at trial: (1) . . . A prior inconsistent statement of a witness, provided **(A)** the statement is in writing or otherwise recorded by audiotape, videotape or some other equally reliable medium, **(B)** the writing or recording is duly authenticated as that of the witness, and **(C)** the witness has personal knowledge of the contents of the statement. . . ." Conn. Code Evid. §8-5 (1); see also *State* v. *Hamilton*, 352 Conn. 317, 345 n.14, 336 A.3d 1188 (2025).

satisfying the requirements of other hearsay exceptions, is presumptively admissible." (Internal quotation marks omitted.) *State* v. *Trotter*, 69 Conn. App. 1, 10, 793 A.2d 1172, cert. denied, 260 Conn. 932, 799 A.2d 297 (2002).

In addition, "[a] statement is admissible as a prior inconsistent statement . . . only when the trial court is persuaded that, taking the testimony of the witness as a whole, the statements are in fact inconsistent. . . . Inconsistencies may be shown not only by contradictory statements but also by omissions. In determining whether an inconsistency exists, the testimony of a witness as a whole, or the whole impression or effect of what has been said, must be examined. . . . Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement . . . and the same principle governs the case of the forgetful witness. . . . A statement's inconsistency may be determined from the circumstances and is not limited to cases in which diametrically opposed assertions have been made. Thus, inconsistencies may be found in changes in position and they may also be found in denial of recollection." (Citation omitted; internal quotation marks omitted.) *State* v. *Eaton*, 59 Conn. App. 252, 263–64, 755 A.2d 973, cert. denied, 254 Conn. 937, 761 A.2d 763 (2000).

The respondent, the Commissioner of Correction, argues that the habeas court did not misstate the law by concluding that there was no legal basis for the admission of Poteat's statement as substantive evidence. The respondent relies on the fact that the content of Poteat's written police statement was never admitted into evidence at the habeas trial because the court admitted Poteat's statement only for the limited purpose of showing that Franckling had it in his possession during the criminal trial. The respondent argues that, because Poteat's statement was not admitted as a full exhibit, its content may not be considered as evidence that Franckling had performed deficiently. The respondent contends that the court, therefore, correctly concluded that the petitioner "ha[d] not provided any legal basis for the

admission of the statement as substantive evidence." We do not agree with the respondent.

Our plenary review of the record as a whole reflects that, although the habeas court admitted Poteat's prior statement for the limited purpose of showing that Franckling had the statement in his possession during the criminal trial, there was testimony at the habeas trial as to the content of the statement. The following colloquy between the petitioner's counsel and Franckling occurred during the habeas trial:

"Q. Attorney Franckling, did Ms. Poteat subsequently testify at trial?

"A. Yes, she did.

"Q. Okay. And did she testify in accordance with the statement that you had previously reviewed with [the petitioner]?

"A. No. In part, but no.

"Q. Okay. How significant were the inconsistencies between her witness statement and her testimony?

"A. . . . I believe in the initial statement she said she did not see the shooting and she ran off. She heard the gunshot. Whereas at trial she said she witnessed the shooting from pretty close distance."

Moreover, as previously noted in this opinion, the transcript of the criminal trial, which was admitted into evidence at the habeas trial, reveals that the prior statement was inconsistent with Poteat's trial testimony. Indeed, during the state's direct examination of Poteat at the criminal trial, Poteat admitted that her testimony contradicted her written police statement. Poteat agreed that, in her written police statement, she had stated that she saw the petitioner approach the victim and, because she did not think anything would happen, she turned around and that, as she turned, heard a gunshot and then ran. However, she testified at trial that, from approximately twenty feet away, she observed the

petitioner shoot the victim before the petitioner looked directly at her.

Accordingly, based on the record before us and the legal principles that govern the admissibility of prior inconsistent statements under *Whelan*, Poteat's prior statement to DeMatteo would appear to qualify as a prior inconsistent statement admissible as substantive evidence under *Whelan*. We have already highlighted some of the significant ways in which Poteat's statement to the police was inconsistent with her testimony at the criminal trial, and the evidence before the habeas court reflects that **(1)** the statement was in writing, **(2)** the statement was signed by Poteat,[6] **(3)** Poteat had personal knowledge of the facts in the statement, and **(4)** Poteat testified at the criminal trial and was subject to cross-examination by the defense. Thus, to the extent the habeas court determined that the petitioner did not provide any legal basis for the admission of the statement as substantive evidence, such determination was legally incorrect.

However, our conclusion that the statement would have been admissible is not dispositive of whether Franckling's performance was deficient because he did not offer the statement into evidence. According to the petitioner, his ineffective assistance claim has merit because Franckling had no strategic reason for not offering Poteat's statement under *Whelan*. The petitioner argues that Poteat's statement was "a classic prior inconsistent statement, admissible for both substantive and credibility purposes . . . ." The petitioner argues that "[i]t is immaterial that Poteat acknowledged giving her prior statement to the police for purposes of determining whether it was substantively admissible. The purpose of admitting a statement under *Whelan* goes beyond simply alerting the jury to the fact that a prior statement was made. The purpose of admitting a statement under *Whelan* is to place the

---

[6]DeMatteo testified that written statements are typed for legibility purposes, shown to the person making the statement so that the person may review it for accuracy or make any changes, and sworn to and signed by the person making the statement.

statement before the jury to determine whether it should credit the prior statement as the truth and reject a witness' in-court testimony."

At the habeas trial, Franckling testified with respect to his reasons for not offering Poteat's police statement under *Whelan*. First, Franckling testified that he chose not to offer Poteat's statement because it was beneficial from a defense standpoint that the inconsistencies at issue were elicited by the state on direct examination as a preemptive strike and, further, he had questioned Poteat about some of the other inconsistencies. Franckling believed that the inconsistencies had already been put before the jury, and, thus, it was not necessary for him to introduce the statement into evidence. Second, Franckling testified that he did not offer Poteat's statement because it contained "a paragraph or two that weren't in evidence that I didn't want to have any chance of getting in evidence." Third, Franckling testified that he did not offer Poteat's statement into evidence as a *Whelan* statement because part of her statement, although different from her testimony, was actually corroborated by other inculpatory evidence found at the shooting scene, which the state had presented at trial. Specifically, Franckling testified that, in the written statement, Poteat stated that she had observed the victim drink a sip of beer immediately before the petitioner shot him. The state had presented evidence that, when the police arrived at the shooting scene, there was a can of Steel Reserve brand beer lying next to the victim. Finally, Franckling testified that it was not uncommon for a witness' testimony to differ from the initial statements that the witness provided to the police.

On appeal, the petitioner downplays the reasonableness of the strategic reasons Franckling articulated for not offering Poteat's written statement into evidence under *Whelan*. The petitioner argues that Franckling could have asked that the criminal court admit only the portions of the statement that were inconsistent with Poteat's trial testimony. The petitioner also argues that,

even if the entire statement had been admitted, "the substance of the portions of the statement that Franckling was concerned about were presented to the jury, and were even bolstered, without objection by Franckling, by the testimony of DeMatteo, who indicated that Poteat had indicated those very things in her written statement."[7]

The respondent argues that the petitioner failed to prove that it was objectively unreasonable for Franckling not to offer Poteat's written police statement into evidence during the petitioner's criminal trial. The respondent further argues that Franckling's decision to cross-examine Poteat on the inconsistencies between her written police statement and trial testimony, without offering her statement into evidence, is the type of strategic decision that is virtually unchallengeable in a habeas action. We agree with the respondent.

We reiterate that "[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged

---

[7]The petitioner also argues that this court should not be persuaded by Franckling's testimony that he was concerned that the evidence of the beer can tended to corroborate Poteat's statement. The petitioner maintains that "[i]t is dubious to attribute this testimony as the actual strategic reason for Franckling's decision, given that he only generally agreed with the respondent's premise [when questioned about the beer can by the respondent's counsel during cross-examination at the habeas trial]." Moreover, the petitioner relies on the fact that, during the state's redirect examination of DeMatteo at the criminal trial, the prosecutor elicited from DeMatteo that the police had found a can of Steel Reserve beer next to the victim and that Poteat had included in her statement that she had observed the victim drinking from a can of beer. The petitioner argues that Franckling's failure to object to this testimony, which he describes as "breathtaking incompetence," undermines this strategic reason for failing to introduce the statement under *Whelan*.

conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (Internal quotation marks omitted.) *Franko* v. *Commissioner of Correction*, 165 Conn. App. 505, 512, 139 A.3d 798 (2016); see also *Jordan* v. *Commissioner of Correction*, 341 Conn. 279, 290, 267 A.3d 120 (2021) (regardless of whether trial counsel articulates strategic reasons for challenged actions, "the court must contemplate the possible strategic reasons that might have supported the challenged action and then consider whether those reasons were *objectively reasonable*" (emphasis added)).

At the habeas trial, Franckling articulated several reasons why he chose not to offer Poteat's written statement into evidence under *Whelan*. The petitioner did not present any evidence demonstrating that Franckling's decision not to offer the statement under *Whelan* was objectively unreasonable. We conclude that it was reasonable for Franckling not to offer Poteat's statement substantively because he did not want the jury exposed to the portions therein that corroborated the state's case, thereby undermining his defense strategy of challenging Poteat's credibility. The petitioner erroneously treats Franckling's desire to avoid drawing the jury's attention to Poteat's reference to the victim drinking beer immediately prior to the shooting as Franckling's only rationale for not offering the statement. However, during his direct examination at the habeas trial, Franckling testified that there were about two paragraphs of Poteat's statement that he did not want before the jury—not only the single reference in the statement to the victim's being in possession of a beer can immediately before

he was shot. Because Franckling was concerned about the potentially harmful portions of Poteat's statement being substantively admitted into evidence, he made an objectively reasonable strategic decision not to offer the statement under *Whelan*. In light of Franckling's reservations about placing parts of the prior statement before the jury, it was not unreasonable for Franckling to decide that it was advantageous to the defense to rely on his cross-examination of Poteat to highlight the inconsistencies between her trial testimony and her prior statement. In fact, the petitioner has failed to demonstrate that there were any inconsistencies that were not effectively brought to the attention of the jury during the examination of Poteat by the state and the defense. Accordingly, although the habeas court erroneously determined that there was no legal basis on which to admit Poteat's police statement into evidence, we are persuaded that it correctly concluded that the petitioner failed to satisfy his burden of proving that Franckling had rendered constitutionally deficient performance by not offering Poteat's statement into evidence pursuant to *Whelan*.

In light of our conclusion that the petitioner has failed to demonstrate that Franckling performed deficiently, we need not reach the merits of his claim that he was prejudiced by Franckling's representation. "This court has repeatedly explained that a court may resolve ineffective assistance of counsel claims on either the performance prong or the prejudice prong. See, e.g., *Soto* v. *Commissioner of Correction*, [215 Conn. App. 113, 120, 281 A.3d 1189 (2022)]. . . . [See also] *Quint* v. *Commissioner of Correction*, 211 Conn. App. 27, 36 n.7, 271 A.3d 681 ([i]n light of our determination that the petitioner failed to establish that [counsel's] performance was deficient, we need not address the prejudice prong), cert. denied, 343 Conn. 922, 275 A.3d 211 (2022); *Grover* v. *Commissioner of Correction*, 183 Conn. App. 804, 818 n.7, 194 A.3d 316 ([w]hen a petitioner has failed to meet the performance prong of *Strickland*, we need not reach the issue of prejudice . . .), cert. denied, 330 Conn. 933, 194

A.3d 1196 (2018)." (Internal quotation marks omitted.) *Walcott* v. *Commissioner of Correction*, 238 Conn. App. 545, 569 n.11,     A.3d     (2026).

## II

Next, the petitioner claims that the habeas court erred in concluding that his criminal trial counsel did not render ineffective assistance by failing to demonstrate the impossibility of the accuracy of certain of Poteat's trial testimony. We are not persuaded.

At the petitioner's criminal trial, there was evidence that, in June 2014, Vine Street was under construction. There were several cut-throughs between Vine Street and Magnolia Street. Dzierzgowski identified cut-throughs "behind 714 Albany," "44 Vine Street," and "40 [Vine Street], which cuts from Vine Street heading eastbound to . . . about 125 Magnolia Street." Detective Jason Lee of the Hartford Police Department testified that the cut-through at issue in this case was "a shortcut from Magnolia Street, which is the street east of Vine Street . . . through yards, just so that you don't have to walk the whole block. So, people . . . cut through a backyard where there's a gap in the fence sometimes or no fence at all and then as a shortcut to Vine Street, but it's referred to as a cut-through." Despite the ongoing construction at the time of the shooting, an individual could still use the cut-through to walk from Magnolia Street to Vine Street, which would take approximately twenty seconds. Like Dzierzgowski, DeMatteo testified that there was a cut-through at 44 Vine Street. There was evidence that the victim's body was discovered nearby at 26 Vine Street.

We have already set forth Poteat's testimony about how the shooting occurred. We reiterate Poteat's testimony that, when Jojo's car was parked near Magnolia Street, she observed the petitioner walk through a cut-through between Magnolia Street and Vine Street. Poteat also testified that, after Jojo drove to Vine Street,

she got out of the car and observed the petitioner, while standing in a cut-through, shoot the victim.

The petitioner argues that Franckling could have used evidence presented at the criminal trial to demonstrate that Poteat's testimony—that she observed the petitioner shoot the victim—could not possibly be accurate. Specifically, he relies on DeMatteo's testimony that, due to the construction in the area at the time, the closest cut-through to the scene of the shooting would have been at 44 Vine Street. The petitioner argues that Franckling also could have relied on photographs that, at the habeas trial, had been admitted into evidence by agreement of the parties as exhibits 9, 10 and 11. In the petitioner's view, these photographs "demonstrate the available evidence that Franckling should have used to demonstrate to the jury that Poteat's testimony was impossible." The petitioner argues that DeMatteo's testimony in conjunction with the photographic evidence submitted at the habeas trial clearly demonstrated that Poteat's testimony that she had observed the petitioner shoot the victim was not possibly accurate.

The petitioner correctly notes that Franckling, during his cross-examination of Poteat at the criminal trial, had utilized a map to suggest to the jury that, due to a bend on Magnolia Street, Poteat would not have been able to see the petitioner enter the cut-through on *Magnolia Street* from her claimed vantage point. The petitioner contends, however, that Franckling, did not suggest to the jury, through cross-examination or otherwise, that the location of the cut-through on *Vine Street* in relation to where the victim was found by the police demonstrates that Poteat's testimony that she witnessed the shooting itself was not possibly accurate. The petitioner claims that there is no imaginable strategic purpose for Franckling not utilizing the location of the cut-through to challenge Poteat's testimony.

Whether Franckling performed deficiently is measured by the standard of objective reasonableness. "Regarding ineffectiveness claims relating to the failure to [impeach]

witnesses, [w]hen faced with the question of whether counsel performed deficiently by failing to [impeach] a certain witness, the question is whether this omission was objectively reasonable because there was a strategic reason not to [impeach] such . . . testimony . . . [and] whether reasonable counsel could have concluded that the benefit of [impeaching the witness' testimony] . . . was outweighed by any damaging effect it might have. . . . Moreover, our habeas corpus jurisprudence reveals several scenarios in which courts will not second-guess defense counsel's decision not to [impeach] certain witnesses . . . such as when . . . counsel learns the substance of the witness' testimony and determines that [impeaching] that witness is unnecessary or potentially harmful to the case . . . ." (Citation omitted; internal quotation marks omitted.) *Jordan* v. *Commissioner of Correction*, supra, 341 Conn. 304.

At the outset of the habeas trial, the petitioner's attorney stated, in the absence of objection by the respondent, that exhibits 9, 10 and 11 were "coming in [to evidence] as full by agreement of the parties."[8] During the habeas trial, however, the petitioner did not elicit any testimony about or utilize these exhibits, let alone demonstrate how they could have been useful to Franckling in his examination of Poteat. It is thus unclear how these photographic exhibits support the petitioner's claim that Franckling performed deficiently.

In discussing his trial strategy, Franckling testified at the habeas trial that self-defense was not a viable defense in this case, nor was this a case of mistaken identity. Franckling testified that he believed the best strategy was to challenge the state's evidence, in part, by bringing to the jury's attention the inconsistencies between Poteat's trial testimony and her police statement. The evidence reflects that Franckling questioned Poteat about her ability to see the petitioner enter the cut-through on Magnolia Street, particularly in light of a bend in

_____

[8]The exhibit list in the court file refers to these exhibits as photographs of Vine Street.

Magnolia Street and the presence of houses and trees in the area. Nevertheless, the petitioner's counsel asked Franckling why he had failed to question Poteat "about her inability to see down *Magnolia Street* the way that she claimed she did in her statement . . . ." **(Emphasis added.)** The petitioner's counsel then asked Franckling: "And why didn't you ask . . . Poteat any questions regarding the ongoing construction in the area that night?" Franckling replied, "I don't know why I would. I mean, there's blue construction fencing that's visible. But the testimony was that you could get from Magnolia [Street] to Vine [Street] through the cut." The petitioner's counsel, however, did not explicitly ask Franckling to explain his reasons for not directly questioning Poteat about her ability to observe the cut-through on Vine Street.

The respondent's counsel asked Franckling whether the jury had before it photographs of the crime scene, including photographs that depicted the construction fencing. Franckling stated that such photographs were part of the evidence before the jury. Moreover, the evidence before the habeas court reflects that, at the petitioner's criminal trial, Dzierzgowski, referring to maps that depicted the area of the shooting on June 11, 2014, testified with respect to the location at which the victim was found by the police and the location of the various cut-throughs between Magnolia Street and Vine Street. Similarly, DeMatteo, referring to an aerial photograph, noted the location of 26 Vine Street, the location at which Poteat claimed the victim was shot, and he noted the location of 44 Vine Street, the location of the nearest cut-through from Magnolia Street.

Franckling articulated a reasonable trial strategy. Moreover, we recognize that, although "trial counsel's testimony may identify specific strategic or tactical reasons counsel had for the challenged action . . . *the habeas court is not confined to consider only those reasons identified.* Rather, in all circumstances, the strong presumption of *Strickland* that counsel exercised reasonable professional judgment requires the habeas court to

affirmatively entertain the range of possible reasons that trial counsel might have had for the challenged action." (Emphasis added; internal quotation marks omitted.) *Jordan* v. *Commissioner of Correction*, supra, 341 Conn. 290. On the basis of the evidence presented at the habeas trial, we are persuaded that Franckling acted within the wide range of reasonable professional assistance by (1) concluding that the jury had before it ample evidence from which to determine whether Poteat was able to observe the petitioner at the time of the shooting, and (2) choosing to focus his impeachment efforts on the inconsistencies between Poteat's trial testimony and her police statement. This is particularly so because there was evidence of the location of the victim on Vine Street, the nearest cut-through on Vine Street, the existence of construction fencing on Vine Street at the time of the shooting, and Poteat's claimed vantage point on Vine Street when she observed the petitioner. DeMatteo's trial testimony that there was construction on Vine Street at the time of the shooting, in the absence of other relevant evidence that suggests that the construction rendered Poteat's testimony not possibly accurate, does not lead us to conclude that it was objectively unreasonable for Franckling not to take any additional steps to impeach Poteat's testimony about the shooting. Franckling's trial strategy was reflected in his cross-examinations of Poteat and DeMatteo, and in his strategy he prioritized the fact that Poteat had told DeMatteo that she turned away from the petitioner before the shooting occurred and, thus, *did not witness the shooting*. We cannot second-guess this strategy, for it was reasonable for Franckling to impeach Poteat by focusing on the compelling evidence that she did not witness the shooting rather than suggesting to the jury that her trial testimony was not possibly accurate. Thus, we agree with the habeas court's assessment that Poteat was adequately impeached even in the absence of additional efforts by Franckling to further call into question her ability to see the cut-through on Vine Street.

Because we conclude that the petitioner failed in his burden of demonstrating deficient performance in

connection with this claim, we need not consider the merits of his claim that he was prejudiced by Franckling's performance. See, e.g., *Walcott* v. *Commissioner of Correction*, supra, 238 Conn. App. 569 n.11.

The judgment is affirmed.

In this opinion the other judges concurred.